UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

KENDALL GARLAND,                                   :
                 Plaintiff,               :
                                      :
            v.                                     :       No. 2:19-cv-2996
                                      :
PROBATION OFFICER AGENT                            :
DAVID KNORR, PROBATION                             :
SUPERVISOR MICHAEL HERNANDEZ, :
and the CITY OF PHILADELPHIA,                       :
               Defendants.              :
_____

**O P I N I O N**
**Defendant City of Philadelphia's motion to dismiss, ECF No. 17 — GRANTED**
**Defendants David Knorr and**
**Michael Hernandez's motion to dismiss, ECF Nos. 28 — GRANTED**

**Joseph F. Leeson, Jr.**                                                    **June 5, 2020**
**United States District Judge**

## I.    INTRODUCTION

This is a civil rights action in which *pro se* Plaintiff Kendall Garland alleges multiple

constitutional violations arising from his arrest in 2017 for violating the terms of his probation

and his subsequent incarceration.  Defendant the City of Philadelphia ("the City") has moved to

dismiss the Amended Complaint on the grounds that Garland fails to adequately plead facts

plausibly supporting either a constitutional violation in the first instance, or a claim of municipal

liability under 42 U.S.C. § 1983.  Individual Defendants, Probation Officer David Knorr and

Probation Supervisor Michael Hernandez (collectively, "Individual Defendants"), have also

moved to dismiss the Amended Complaint.  They argue, among other things, that Garland's

claims in this case are precluded by an adverse judgment in a previously-filed state court lawsuit

in which Garland raised essentially the same claims.

Upon consideration of the Defendants' motions to dismiss, and for the reasons set forth below, both motions are granted, and the Amended Complaint is dismissed.

## II.   BACKGROUND

### A.   Facts alleged in the Amended Complaint[1]

At some point in January 2017, Garland was alleged to have violated Pennsylvania's Sex Offender Registration and Notification Act ("SORNA"). [2]  Am. Compl. ¶ 5.  Based upon these allegations Garland was arrested and incarcerated until June 2017.[3]  *Id*.  Around that time, the SORNA charges were "resolved" in Garland's favor, he was released from prison, and Agent Knorr was assigned to be his probation officer.  *Id*.

According to the Amended Complaint, "[a]t some point prior [to June 2017], [Garland] was informed that [he] would no longer be permitted to own his personal laptop."  Am. Compl. ¶

---

[1]      These allegations are accepted as true, with all reasonable inferences drawn in Garland's favor.  *See Lundy v. Monroe Cty. Dist. Attorney's Office*, No. 3:17-CV-2255, 2017 WL 9362911, at *1 (M.D. Pa. Dec. 11, 2017), *report and recommendation adopted*, 2018 WL 2219033 (M.D. Pa. May 15, 2018).  Additionally, as a *pro se* litigant, Garland's pleadings are liberally construed.  *See Bailey v. Kirsch*, No. CV 19-3263, 2020 WL 605881, at *2 (E.D. Pa. Feb. 6, 2020).  However, neither conclusory assertions nor legal contentions need be considered by the Court in determining the viability of Garland's claims.  *See Brown v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*, No. 1:19-CV-1190, 2019 WL 7281928, at *2 (M.D. Pa. Dec. 27, 2019).

[2]      The Court takes judicial notice of one of Garland's several other lawsuits filed in this Court, *Garland v. Bonds et al.*, CV 19-1874, which concerned events surrounding Garland's arrest for violations of SORNA in 2017.  In CV 19-1874, which was recently dismissed, *see Garland v. Bonds*, No. 2:19-CV-01874, 2020 WL 2126330 (E.D. Pa. May 5, 2020), Garland alleged that he was falsely arrested and maliciously prosecuted for violating SORNA by failing to update his residential address as required by the Act, violations which he claimed were baseless.  Documents submitted with dispositive motion practice in CV 19-1874 indicated that Garland's SORNA obligations stemmed from a criminal conviction for aggravated indecent assault in 2005.  *See* CV 19-1874, ECF no. 27-5 at 11.

[3]      Other documents submitted as part of dispositive motion practice in CV 19-1874 indicate a timeline for the events in early 2017:  in January 2017, Garland was discovered to be in violation of SORNA for not having updated his residential address; in February 2017, a warrant for his arrest issued; and in March 2017, Garland was arrested pursuant to the warrant.  *See* CV 19-1874, ECF No. 27-4, 27-5.

6.  The Amended Complaint avers that "[t]his condition, even by itself, should have been known to be illegal and a violation of [Garland's] constitutional rights under due process and an undue infringement upon [his] liberty interests." *Id*. ¶ 7.  This is especially so, according to Garland, in light of his background and training as a software and web developer and given that his 2005 conviction for aggravated indecent assault — the source of his SORNA obligations —"had nothing to do with technology at all." *Id*.  Nevertheless, Garland sold his laptop at a pawn shop and backed up its files to two portable hard drives. *Id*. ¶ 8.

The Amended Complaint next states that at some point after his assignment to Garland's case — exactly when is not clear —"Defendant Knorr stated to [Garland] that he fully expected [Garland] to be in prison because, as Agent Knorr stated quite emphatically, 'I know you broke the law and should be in prison, but instead here you sit in front of me.'"[4]  Am. Compl. ¶ 10. Similarly, Garland alleges Knorr was "quite hostile and belligerent towards" him. *Id*. ¶ 11.

On August 8, 2017, Knorr conducted a visit to Garland's residence, and "without [Garland's] permission or consent, and without probable cause," conducted a search of Garland's person. Am. Compl. ¶¶ 12-13.  Garland avers that in conducting this search, Knorr was "essentially looking for a reason to arrest" him, as indicated by Knorr's statements that he believed Garland should be in prison. *Id*. ¶ 15.  During his August 8, 2017 visit, Knorr noticed the devices Garland had used to back up the contents of his laptop. *Id*. ¶ 17.  Upon noticing these devices, Knorr informed Garland that he was subject to a complete and total ban of all computer and internet access, and that the portable hard drives appeared to be utilized for

---

[4]     Garland makes this argument in several places in his Amended Complaint.  For example, he contends that "[t]here is no way that Agent Knorr would have detained, arrested or initiated revocation proceedings regarding a speculative and tenuous allegation of alleged computer usage in 2017 or even previously, had [Garland] not been successful regarding the termination of the earlier 2017 SORNA charges."  Am. Compl. ¶ 33.

computer and/or internet access.  *See id.* ¶¶ 18-20.  Knorr then seized the hard drives "without [Garland's] permission or consent."  *Id.* ¶ 20.  Knorr also "repeatedly asked [Garland] if these devices had wi-fi capability," which, the Amended Complaint contemplates, was likely because he did not realize what the devices were.  *Id.* ¶ 21.

As a result of his possession of the external hard drives, Knorr handcuffed and arrested Garland and initiated revocation proceedings on the basis that Garland had "accessed a computer and/or the internet."  Am. Compl. ¶ 22.  Garland alleges this conduct was "without cause."  *Id.* Prior to being transported to jail, Garland observed that Knorr "appeared to contact his supervisor for permission to continue to detain [Garland]."  *Id.* ¶ 24.  Garland moreover states that he noticed this procedure — a probation officer's contacting of his or her supervisor — previous times when he had been arrested on allegations of probation violations.  *Id.*

According to the Amended Complaint, Knorr's supervisor was Michael Hernandez, whose signature appears on the "request for probation revocation that charges [Garland] with accessing a computer."  Am. Compl. ¶ 27.  Garland avers that, like Knorr, Hernandez "should have known in August, 2017 that a complete and total ban on all computer and / or internet access would be violation of [Garland's] constitutional rights."  *Id.* ¶ 28.  This information should have been known to Hernandez and Knorr, Garland claims, based upon the United States Supreme Court's decision in "*Packingham v. North Carolina* . . . which specifically invalidated state regulations from prohibiting certain convicted persons from prohibiting certain convicted persons from using any social medial platform as being too broad."  *Id.* ¶ 31.  The Amended Complaint avers that by failing to bar or prevent Garland's arrest based upon his possession of the external hard drives, and rather approving the arrest, Hernandez was "deliberately indifferent" to Garland's constitutional rights.  *Id.* ¶ 29.

Upon his arrest, Garland was transported "to the Philadelphia Prison System" and was incarcerated in "the House of Corrections."  Am. Compl. ¶¶ 37-38.  The Amended Complaint avers that a "warrant for detention was issued in order to have [Garland] detained in the Philadelphia prison."  *Id.* ¶ 39.  According to Garland, the warrant should have given the City of Philadelphia reason "to examine the situation" and prevent Garland's unlawful detention; however, the City "did nothing and acquiesced."  *Id.* ¶ 40.

According to the Amended Complaint, the House of Corrections was, at the time of Garland's detention, "overcrowded" with many probation violation detainees, some having "serious open cases involving guns or violence."  Am. Compl. ¶ 41.  Similarly, Garland contends that "[t]he Philadelphia prison system is often understaffed to handle the sheer capacity and constant flow of inmates being admitted into the prison system."  *Id.* ¶ 42.  Moreover, because the "House of Corrections is an older prison," Garland claims it "should not be allowed to house as many inmates as there seemed to be housed there."  *Id.* ¶ 43.  According to Garland, inmates in this facility "are often forced to endure horrible and extra harsh conditions of incarceration . . . . Supplies, soap and basic necessities are often deprived prisoners."  *Id.* ¶ 44.  He additionally claims that prison staff are "often not properly trained" and "not the most highly compensated city employees," which "creates a highly volatile environment where city employees are often less than caring," and which in turn leads to inmates having to "fend for themselves and attempt to protect themselves."  *Id.* ¶ 45.  As evidence of this, Garland states that "while incarcerated," he "was attacked an [sic] injured" and "has incurred continued right shoulder pain, which has required therapy to heal."[5]  *Id.* ¶¶ 56-57.

---

[5]     This is the only reference to any physical attack Garland claims he suffered while incarcerated.

Garland attributes all of his grievances as to the conditions of the "Philadelphia Prison System" to the City's "policies and procedures of permitting overcrowded prisons, with understaffed workers, workers who many [sic] are not properly trained, and also policies of providing insufficient materials to adequately cover basic needs like soap for showers." Am. Compl. ¶ 46.

In addition to his grievances regarding the conditions of his confinement, Garland states that he had a "Gagnon I" hearing while incarcerated, at which time City officials "could and should have examined the situation and released [Garland] or perhaps even at the very least, recommended release of [Garland] pending the eventual Gagnon II hearing."[6] Am. Compl. ¶ 49. In support of this, Garland states that he has "previously been released from the city of Philadelphia prison system by City of Philadelphia employees prior to a Gagnon II hearing when incarcerated under an alleged probation violation when the allegations of a violation of probation have been found to not be serious." *Id*. ¶ 50.

Garland states that his ordeal ended on December 8, 2017. On that date a "probation hearing" was held, at which "the Court stated that the condition of probation imposed . . . a complete ban on all computer and internet access[,] was an unreasonable condition of probation." Am. Compl. ¶ 53. As a result, "[t]he Court lifted [Garland's] probation detainer that

---

[6]    "In *Gagnon v. Scarpelli,* the Supreme Court held that a person accused of violating the terms of his probation was entitled to two hearings before revocation and re-sentencing." *Heilman v. T.W. Ponessa And Assoc.*, No. 08-1667, 2009 WL 82707, at *1 n.1 (3d Cir. Jan. 14, 2009) (citing *Gagnon v. Scarpelli,* 411 U.S. 778, 781-82 (1973)). "The first, a *Gagnon I* hearing, serves to determine whether there was probable cause for the probation revocation. The second, a *Gagnon II* hearing, determines whether the person in fact violated the conditions of his or her probation and whether s/he should be incarcerated." *Heilman*, 2009 WL 82707, at *1 n.1 (citing *Gagnon,* 411 U.S. at 782, 784).

had been lodged against [him]," and the proceedings consequently terminated in his favor.  *Id.* ¶¶ 54-55.

Based upon the above factual averments, Garland asserts claims for malicious prosecution, abuse of process, false arrest and imprisonment, and unlawful search and seizure "under both the Fourth Amendment and applicable state law, and also retaliation and harassment[7] for the exercise of Constitutionally protected conduct."  Am. Compl. ¶ 59.

### B.    Relevant procedural background

Garland filed his initial Complaint in this action on July 10, 2019.  *See* ECF No. 2. Service of the Complaint was effected on the City shortly thereafter, however service on Defendant Knorr — the initial Complaint did not name Hernandez as a defendant — was initially unsuccessful.  *See* ECF Nos. 7-8.  The City filed a motion to dismiss on August 30, 2019, which Garland opposed.  *See* ECF Nos. 9-10.  While the City's motion was pending and service was again being attempted on Knorr, Garland moved for leave to amend his Complaint to add Hernandez as a defendant.  *See* ECF Nos. 12-13.  The Court granted the motion and directed that service be attempted anew on both Individual Defendants.  *See* ECF No. 15.

Garland's Amended Complaint was filed on September 30, 2019.  *See* ECF No. 16.  On October 10, 2019, the City moved to dismiss the Amended Complaint.  *See* ECF No. 17.  The Court subsequently granted several extensions of time to serve the Amended Complaint on Knorr and Hernandez, *see* ECF Nos. 19-22; service was properly effected on January 30, 2020, *see* ECF No. 25.  The Individual Defendants' motion to dismiss the Amended Complaint was filed on February 24, 2020.  *See* ECF No. 28.

---

[7]     Throughout this Opinion, the Court refers to "retaliation and harassment" in quotations without addressing whether any such claims exist as proper causes of action.

Garland has filed opposition to both motions to dismiss.  *See* ECF Nos. 18, 29.

## III. LEGAL STANDARD

### A. Motions to dismiss under FED. R. CIV. P. 12(b)(6) — failure to state a claim

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court clarified the appropriate

pleading standard in civil cases and set forth a two-step approach to be used when deciding

motions to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

claim.

<u>First</u>, district courts are to "identify [ ] pleadings that, because they are no more than

conclusions, are not entitled to the assumption of truth."  *Id.* at 679; *see id.* at 678 ("A pleading

that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action

will not do.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))); *Thourot v.

Monroe Career & Tech. Inst.*, No. CV 3:14-1779, 2016 WL 6082238, at *2 (M.D. Pa. Oct. 17,

2016) (explaining that "[a] formulaic recitation of the elements of a cause of action" alone will

not survive a motion to dismiss).  Though "legal conclusions can provide the framework of a

complaint, they must be supported by factual allegations."  *Iqbal*, 556 U.S. at 679.

<u>Second</u>, if a complaint contains "well-pleaded factual allegations, a court should assume

their veracity and then determine whether they plausibly give rise to an entitlement to relief."

*Iqbal*, 556 U.S. at 679.  "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id*. at 678.  This standard, commonly referred as the "plausibility

standard," "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility

that a defendant has acted unlawfully."  *Id*. (citing *Twombly*, 550 U.S. at 556-57)  It is only

where the "[f]actual allegations . . . raise a right to relief above the speculative level" that the

plaintiff has stated a plausible claim.[8]  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).

Putting these two steps together, the Court's task in deciding a motion to dismiss for failure to state a claim is to determine whether, based upon the facts as alleged, which are taken as true, and disregarding legal contentions and conclusory assertions, the complaint states a claim for relief that is plausible on its face.  *Iqbal*, 556 U.S. at 679; *Ashford v. Francisco*, No. 1:19-CV-1365, 2019 WL 4318818, at *2 (M.D. Pa. Sept. 12, 2019) ("To avoid dismissal under Rule 12(b)(6), a civil complaint must set out sufficient factual matter to show that its claims are facially plausible.").

In adjudicating a Rule 12(b)(6) motion, the scope of what a court may consider is necessarily constrained:  a court may "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."[9]  *United States v. Gertsman*, No. 15-8215, 2016 WL 4154916, at *3 (D.N.J. Aug. 4, 2016) (quoting *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013)).

## B.  *Pro se* court filings — liberal construction

Additionally, as noted, *pro se* filings like Garland's motions and related documents "must be liberally construed."  *Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 265 (3d Cir. 2011) (citing *Hartmann v. Carroll,* 492 F.3d 478, 482 n.8 (3d Cir.2007)).  At the same time,

---

[8]      As the Supreme Court counseled, "[d]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679

[9]      Additionally, a court adjudicating a Rule 12(b)(6) motion may take judicial notice of certain undisputed facts.  *See Devon Drive Lionville, LP v. Parke Bancorp, Inc.*, No. CV 15-3435, 2017 WL 5668053, at *9 (E.D. Pa. Nov. 27, 2017).

however, *pro se* litigants "[are] not excused from conforming to the standard rules of civil procedure."  *Peterson v. Weiss*, No. CIV.A. 12-5431, 2012 WL 6042795, at *1 (D.N.J. Dec. 3, 2012) (quoting *McNeil v. United States,* 508 U.S. 106, 113 (1993)); *see Sykes v. Blockbuster Video*, 205 F. App'x 961, 963 (3d Cir. 2006) (explaining that *pro se* plaintiffs are expected to comply with the Federal Rules of Civil Procedure).

## IV.   DISCUSSION

### A.   Garland's claims against the City

Garland's federal constitutional claims are brought pursuant to 42 U.S.C. § 1983.  *See* Am. Compl, Preliminary Statement.  Because the nature and scope of § 1983 liability differs significantly depending on whether the alleged tortfeasor is an individual actor or a municipality, a brief review of these differences is necessary to determine the viability of Garland's claims against the City.

#### 1.   *Legal principles*

##### a.   Liability under 42 U.S.C. § 1983 generally

Title 42 U.S.C. § 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 "is not itself a source of substantive rights"; rather, the statute is a "method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979); *Grammer v. John J. Kane Reg'l Centers-Glen Hazel*, 570 F.3d 520, 525 (3d Cir. 2009) (explaining that § 1983 "is a vehicle for imposing liability against anyone who, under color of

state law, deprives a person of 'rights, privileges, or immunities secured by the Constitution and laws'"); *see Three Rivers Ctr. for Indep. Living v. Hous. Auth. of City of Pittsburgh*, 382 F.3d 412, 422 (3d Cir. 2004) ("Once the plaintiff establishes the existence of a federal right, there arises a rebuttable presumption that the right is enforceable through the remedy of § 1983.").

> To state a viable claim pursuant to § 1983, a plaintiff must allege two essential elements:
>
> (1) that the conduct complained of was committed by a person acting under color of state   law; and
>
> (2) that the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States.

*Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011) (citing *Kost v. Kozakiewicz,* 1 F.3d 176, 184 (3d Cir. 1993)).

Importantly, "[an individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing . . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988)).

### b.      Municipal liability under 42 U.S.C. § 1983: Policy or Custom

In *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), the Supreme Court overruled its holding in *Monroe v. Pape* that "Congress did not undertake to bring municipal corporations within the ambit of [§ 1983]."[10]  365 U.S. 167, 187 (1961).  Since *Monell*, it has been well settled that local governments can be liable as "persons" under § 1983;

---

[10]      In reversing course from its decision in *Pape*, the Court in *Monell* stated as follows: "Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies."  436 U.S. at 690 (emphasis in original).

however, this liability extends only to "their *own* illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original) (quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 479 (1986)); *see Monell,* 436 U.S., at 665-83.  This limitation is a corollary of the established principle that municipalities "are not vicariously liable under § 1983 for their employees' actions." *Connick*, 563 U.S. at 60; *Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.") (emphasis in original).

To avoid § 1983 municipal liability collapsing into vicarious liability, a § 1983 plaintiff seeking to recover against a municipality must, to survive a Rule 12(b)(6) motion to dismiss, plead that the complained-of injury was caused directly by a local government's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Harris v. City of Philadelphia*, 171 F. Supp. 3d 395, 400 (E.D. Pa. 2016) (quoting *Monell*, 436 U.S. at 694).  That is to say, a municipal policy or custom — as opposed to the independent conduct of a municipal employee — must be the "driving force" behind the alleged harm.  *Weston v. City of Philadelphia*, 82 F. Supp. 3d 637, 649 (E.D. Pa. 2015).  In this context, a municipal "[p]olicy is made when a decision maker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Does v. Se. Delco Sch. Dist.*, 272 F. Supp. 3d 656, 667 (E.D. Pa. 2017) (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996)).  A municipal custom, on the other hand, "is established 'by showing that a given course of conduct although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.'" *Kelty v. City of Philadelphia*, No. CV 16-0306, 2016 WL 8716437, at *3 (E.D. Pa. June 10, 2016) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).

Courts have generally recognized several sets of circumstances the existence of which are sufficient to establish a municipal policy or custom for purposes of § 1983 liability:

(1) a formal policy officially promulgated or endorsed by the municipality, *see* Monell, 436 U.S. at 690;

(2) notwithstanding the absence of a formal policy, specific injury-causing actions taken by a government official who is responsible for establishing municipal policies, *see Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 404-05 (1997); *Pembaur*, 475 U.S. at 483;

(3) notwithstanding the absence of a formal policy, a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage having the force of law, *see Bd. of County Comm'rs,* 520 U.S. at 403-04; *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988); *Monell*, 436 U.S. at 690-91; and

(4) notwithstanding the absence of a formal policy, a widespread failure by policymakers to provide adequate training or supervision to subordinates, *see Bd. of County Comm'rs,* 520 U.S. at 407; *City of Canton v. Harris,* 489 U.S. 378, 388 (1989).

### 2.      *Application to Garland's allegations with respect to the City*

As an initial matter, although Garland states that he is asserting claims that, on their face, appear to be directed primarily to the circumstances of his arrest and charging — *i.e.*, malicious prosecution, abuse of process, false arrest and imprisonment, unlawful search and seizure, and "retaliation and harassment," Am. Compl. ¶ 59 — the only conduct for which the City can conceivably be liable is necessarily limited to Garland's treatment once incarcerated.  The conduct behind the investigation of Garland and his subsequent arrest was performed exclusively by the Individual Defendants, who are probation officers.  The City cannot be liable for their conduct because "[t]he probation department is an arm of the state, and its employees are state

actors."[11]  *Johnson v. City of Philadelphia*, No. 13-CV-02963, 2013 WL 4014565, at *6 (E.D.

Pa. Aug. 7, 2013) (quoting *Clark v. Conahan*, 737 F. Supp. 2d 239, 258 (M.D. Pa. 2010)); *see*

*Haybarger v. Lawrence Cty. Adult Prob. & Parole*, 551 F.3d 193, 198 (3d Cir. 2008) ("The

Commonwealth vests judicial power in a unified judicial system, and all courts and agencies of

the UJS are part of the Commonwealth government rather than local entities. As an arm of the

State, an individual judicial district and its probation and parole department are entitled to

Eleventh Amendment immunity." (citations omitted)).  Stated differently, there is no indication

that the City had any involvement with Garland until he was incarcerated.  Therefore, with

respect to the City's motion, the Court focuses its analysis on Garland's allegations beginning

with his transportation "to the Philadelphia Prison System" and his incarceration in "the House

of Corrections."[12]  Am. Compl. ¶¶ 37-38.

Garland names no individual City employee as a defendant; rather, his claims are brought

solely against the City itself.  Because of this, to state any federal claim against the City pursuant

to 42 U.S.C. § 1983, Garland must satisfy the standard set forth in *Monell* and its progeny as

discussed at length above:  he must plausibly allege that a municipal policy or custom was the

"driving force" behind the harm he is alleged to have suffered.  *Weston v. City of Philadelphia*,

82 F. Supp. 3d 637, 649 (E.D. Pa. 2015).  The Court finds that the Amended Complaint fails to

plead the existence of any City policy or custom behind Garland's alleged injuries.

Importantly, the only allegations in the Amended Complaint that could conceivably be

connected to a municipal policy or custom concern unlawful conditions of confinement — a

---

[11]    Garland appears to concede this.  *See* ECF No. 18 at 3-4.
[12]    The Court takes judicial notice of the fact that the City's correctional facilities are operated by the Philadelphia Department of Prisons.  *See* https://www.phila.gov/departments/philadelphia-department-of-prisons/

claim that Garland does not identify in the Amended Complaint as one he is attempting to assert.[13;14]  To this end, Garland avers the following:  that his place of confinement was "overcrowded," Am. Compl. ¶ 41; that "[t]he Philadelphia prison system is often understaffed to handle the sheer capacity and constant flow of inmates being admitted into the prison system," *id.* ¶ 42; that inmates "are often forced to endure horrible and extra harsh conditions of incarceration . . . . Supplies, soap and basic necessities are often deprived prisoners [sic]," *id.* ¶ 44; that staff are "often not properly trained" and "not the most highly compensated city employees," which "creates a highly volatile environment where city employees are often less than caring" and in turn leads to inmates having to "fend for themselves and attempt to protect themselves," *id.* ¶ 45; and that the City has "policies and procedures of permitting overcrowded prisons, with understaffed workers, workers who many [sic] are not properly trained, and also policies of providing insufficient materials to adequately cover basic needs like soap for showers."  *Id.* ¶ 46.

---

[13]    This issue is addressed in further detail below.

[14]    The Court acknowledges that Garland also alleges that the City "could and should have examined the situation and released" him at the time of his *Gagnon I* hearing, Am. Compl. ¶ 49, and that "through it's [sic] policies, procedures and deliberate indifference [the City] caused a prolonged incarceration that was unconstitutional," *id.* ¶ 52.  In his memorandum in opposition to the City's motion, Garland focuses his argument heavily on what he sees as the City's failure to provide him fair *Gagnon* hearings.  *See* ECF No. 18 at 3-6.  However, even assuming Garland was not provided a fair process — which itself is a generous construction as his allegations as to the *Gagnon* process afforded him are conclusory — there is no plausible inference that the City had a *policy or practice* of depriving inmates at large of their rights under *Gagnon v. Scarpelli,* 411 U.S. 778 (1973).  Indeed, Garland's allegations on this point are limited to *his own prior experience* — specifically,  of having been "released from the city of Philadelphia prison system by City of Philadelphia employees prior to a Gagnon II hearing when the allegations of a violation of probation have been found to not be serious."  Am. Compl. ¶ 50.  Such allegations do nothing to suggest a larger policy or practice that extends to the City's treatment of inmates beyond Garland.

Assuming that Garland is attempting to assert a claim against the City for violation of his constitutional rights related to the conditions of his confinement,[15] the above allegations are insufficient to plausibly plead the existence of a municipal policy or custom that caused the harm of which he complains.  The Court illustrates this by comparing Garland's allegations with the several sets of circumstances discussed previously that courts have recognized as sufficient to plead a municipal policy or custom.

First, there is nothing in Garland's allegations supporting the existence of an "official" City policy.  His reference to the existence of certain "policies and procedures" is inherently conclusory.  Simply reciting these words does nothing to plausibly allege the existence of an "official" or "formal" City policy to overcrowd and undersupply the City's prisons or to undertrain prison staff.  Nor are there any specific factual assertions supporting the existence of a formally promulgated City policy to enable these deficiencies; indeed, it is not plausible that the City would ever promulgate such a policy.

Second, there is no reference to, or any allegations regarding, any decision of a City official responsible for setting City policy resulting in the harm Garland alleges.

Next, while Garland may be attempting to allege that the City's practices — specifically with respect to inmates having to "fend for themselves" as well as with respect to inadequate "supplies"— constitute a custom or usage so widespread as to have the force of law, this attempt also fails.  There are simply no specific factual allegations other than his identifying a lack of "soap and basic necessities" that would support such an inference.  On the whole, any allegations

---

[15]     It remains unclear in his memorandum in opposition as to whether Garland is in fact pleading this claim.  *See, e.g.,* ECF No. 18 at 4 ("[D]espite the City of Philadelphia's attempt to characterize the amended complaint as a conditions of confinement complaint . . . the City of Philadelphia also became responsible for providing the plaintiff safe housing and providing for the plaintiff's basic needs.").

through which Garland purports to show a widespread practice with the force of law causing him harm are fatally conclusory.

Finally, Garland's apparent attempt to satisfy the "policy or custom" prerequisite by way of a "failure to train" theory also falls far short. Where an alleged municipal policy "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting *Carter v. City of Phila.,* 181 F.3d 339, 357 (3d Cir. 1999)). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Such a pattern of behavior is necessary to put municipal policymakers on notice that a new program is required; through continued adherence to a policy they know or should know violates the rights of others, they demonstrate deliberate indifference.[16] *Thomas*, 749 F.3d at 223. In light of these requirements, the inherently conclusory nature of Garland's allegations that prison staff are "not properly trained" and "not the most highly compensated city employees" becomes apparent. Such conclusory assertions fall far short of the standard for pleading a failure to train claim.

---

[16] As the Supreme Court observed, a lesser standard of fault for failure-to-train claims brought pursuant to § 1983 "would result in *de facto respondeat superior* liability on municipalities"— a result the Court explicitly rejected in *Monell*. *City of Canton v. Harris,* 489 U.S. 378, 392 (1989).

The above analysis is premised on an assumption that although he does not affirmatively state it, Garland is attempting to plead a conditions of confinement claim.  However, if this is so, the Court agrees with the City's argument that apart from his failure to plausibly allege a requisite municipal policy or custom, Garland's conclusory allegations fail to adequately plead the elements of such a claim.[17]  *See, e.g.*, ECF No. 17 at 6-7.

Garland was incarcerated prior to be convicted of the crimes with which he was charged — violation of his probation; indeed, according to the Amended Complaint, those charges were eventually dismissed.  "Where, as here, a pretrial detainee challenges his conditions of confinement, the court must consider whether there has been a constitutional violation under the Fourteenth Amendment."  *Taylor v. Pennsylvania*, No. CV 17-3369, 2018 WL 6574187, at *10 (E.D. Pa. Dec. 12, 2018), *aff'd sub nom. Taylor v. Dist. Attorneys Office*, 802 F. App'x 701 (3d Cir. 2020); *see Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) ("The Cruel and Unusual Punishments Clause [of the Eighth Amendment] . . . does not apply until an inmate has been both convicted of and sentenced for his crimes.").  Under the Fourteenth Amendment, "a condition of confinement is unconstitutional if it is either 'the result of an express intent to punish' or 'if it is not rationally related to a legitimate government purpose.'"  T*aylor*, 2018 WL 6574187, at *11 (quoting *Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979)).  Garland's assertions that his place of confinement was "overcrowded," that conditions were "horrible and extra harsh," that prisoners were often deprived of "[s]upplies . . . soap and basic necessities," as well as his assertion that he was "attacked" and "injured," are, in the end, inherently conclusory and fail to plausibly allege

---

[17]     Although the Court disagrees with the City that Garland's claim would be subject to analysis under the Eighth Amendment; rather, because Garland was incarcerated before being convicted of the crime at hand — violating his probation — the appropriate analysis is that of a conditions of confinement claim under the Fourteenth Amendment.

that the conditions of his confinement were either the result of an express intent to punish, or disconnected from some legitimate governmental purpose.  As a result, he has failed to state a Fourteenth Amendment conditions of confinement claim.

While Garland's federal claims fail for the several reasons discussed, any claims he is attempting to plead that are premised on *state* law — he asserts that his claims are brought under both federal "and applicable state law," Am. Compl. ¶ 59 — must also fail.  Any state law tort claim against the City is barred by Pennsylvania's Political Subdivision Tort Claims Act, 42 PA. CONS. STAT. § 8541.  That Act provides that "[e]xcept as otherwise provided in this subchapter, no local agency"— the City, as a municipality, is a "local agency," *see Costobile-Fulginiti v. City of Philadelphia*, 719 F. Supp. 2d 521, 525 (E.D. Pa. 2010) —"shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."  The Act in turn waives liability for a limited range of municipal conduct — conduct related to vehicles, conduct related to the care, custody, and control of personal property, real property, trees, traffic controls, utility service facilities, streets, sidewalks, and animals, and conduct related to sexual abuse.  *See* 42 PA. CONS. STAT. § 8542(b). Because the municipal conduct of which Garland complains is not contained in § 8542(b)'s waiver of immunity, his state law claims against the City fail as a matter of law.  *See Lenhart v. Pennsylvania*, 528 F. App'x 111, 114 (3d Cir. 2013) ("[W]e agree with the District Court that to the extent that [plaintiff] raised state law tort claims of intentional infliction of emotional distress, libel, slander, false arrest, and malicious prosecution, the Pennsylvania Political Subdivision Tort Claims Act shields Westmoreland County from suit.").

In sum, the Amended Complaint ultimately fails to state any viable claim against the City, whether brought pursuant to § 1983 for violation of Garland's federal constitutional or statutory rights, or pursuant to Pennsylvania law.

**B.     Garland's claims against the Individual Defendants**

The Individual Defendants contend that the instant action is barred by the doctrine of *res judicata*, which is also called claim preclusion, in light of a judgment of dismissal in a previous lawsuit brought by Garland in state court.  *See* ECF No. 28.  They point out that on July 20, 2018, the Court of Common Pleas for Philadelphia County issued an order granting Garland's application to proceed in that court *in forma pauperis* ("IFP"), and dismissing a lawsuit he had commenced against, among others, David Knorr, as "frivolous" for failure to set forth a cause of action upon which relief could be granted.  The screening and dismissal of that action was implemented pursuant to Pennsylvania's IFP screening statute, PA. R. CIV. P. 240(j).  The Court of Common Pleas' ruling and dismissal was subsequently affirmed by the Superior Court.  *See Garland v. Gardner*, No. 2433 EDA 2018, 2019 WL 517687 (Pa. Super. Ct. Feb. 11, 2019).

For the reasons set forth below, the Court agrees with the Individual Defendants that the doctrine of *res judicata* bars Garland's instant suit against both Knorr and Hernandez.

**1.     *Legal principles*:  *the legal doctrine of* res judicata**

Where a defendant in a federal action raises as a defense preclusion based upon a previously-rendered state court judgment, the federal court must "look[ ] to the law of the adjudicating state to determine its preclusive effect."[18]  *Greenleaf v. Garlock, Inc.*, 174 F.3d 352,

---

[18]     Under the Full Faith and Credit Act, 28 U.S.C. § 1738, state court decisions are given "the same preclusive effect in federal court they would be given in the courts of the rendering state."  *Del. River Port Auth. v. Fraternal Order of Police, Penn-Jersey Lodge 30*, 290 F.3d 567, 573 (3d Cir. 2002).

357 (3d Cir. 1999).  Pennsylvania law "bars a later action on all or part of the claim which was the subject of the first action.  Any final, valid judgment on the merits by a court of competent jurisdiction precludes any future suit between the parties or their privies on the same cause of action."  *Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d 542, 548 (3d Cir. 2006) (quoting *Balent v. City of Wilkes–Barre*, 669 A.2d 309, 313 (Pa. 1995)).  With respect to the doctrine of *res judicata* in particular, under Pennsylvania law,

> [a]pplication of the doctrine . . . as an absolute bar to a subsequent action requires that the two actions possess the following common elements:
>
> (1) identity of the thing sued upon;
>
> (2) identity of the cause of action;
>
> (3) identity of the parties; [and]
>
> (4) identity of the capacity of the parties.

*Robinson Coal Co. v. Goodall*, 72 A.3d 685, 689 (Pa. Super. Ct. 2013).  Importantly, "[r]es judicata applies not only to claims actually litigated, but also to claims which could have been litigated during the first proceeding if they were part of the same cause of action."  *Balent*, 669 A.2d at 313.

### 2.    *Application to Garland's suits*

"Under both federal and Pennsylvania law, a central hallmark of [*res judicata*] is that a prior judgment may bar relitigation only of a claim that has been decided 'on the merits.'" *Weinar v. Lex*, 176 A.3d 907, 915 (Pa. Super. Ct. 2017).  Consequently, the first question the Court addresses is whether the 2018 dismissal of Garland's state court lawsuit constitutes a final judgment "on the merits" that is entitled to preclusive effect.

### a.     Final judgment on the merits

As noted, the Court of Common Pleas dismissed Garland's complaint as "frivolous" for failing to set forth a valid cause of action pursuant to PA. R. CIV. P. 240(j), a ruling which was subsequently affirmed by the Superior Court.  *See Garland.*, 2019 WL 517687, at *1.  Rule 240(j)(1) provides as follows:

> If, simultaneous with the commencement of an action or proceeding or the taking of an appeal, a party has filed a petition for leave to proceed *in forma pauperis*, the court prior to acting upon the petition may dismiss the action, proceeding or appeal if the allegation of poverty is untrue or if it is satisfied that the action, proceeding or appeal is frivolous.

The ultimate question then is whether a dismissal pursuant to Rule 240(j)(1) can properly be considered a final judgment "on the merits."

At the outset, the Court notes that the state of the law in Pennsylvania as to whether a dismissal pursuant to Rule 240(j)(1) obtains preclusive effect does not appear to be firmly settled.  Upon its own independent research, the Court has not identified a case or authority that affirmatively holds that dismissals under Rule 240(j) are subject to *res judicata*.[19]  Yet, as explained below, it is hard to escape the conclusion that the principles of *res judicata* apply with equal force to dismissals under Rule 240(j) as to other dismissals — especially those that operate under identical standards and result in identical outcomes.

"For *res judicata* purposes, a judgment on the merits 'is one that actually pass[es] directly on the substance of [a particular] claim before the court.'"  *Weinar*, 176 A.3d at 915

---

[19]     In a 1997 decision, the Pennsylvania Commonwealth Court noted that because of the way it had resolved a case, "[it] need[ed] not address whether claim preclusion applies" to a dismissal as "frivolous" under Rule 240(j).  *McGriff v. Vidovich*, 699 A.2d 797, 798 n.1 (Pa. Commw. Ct. 1997).  Several years later, the U.S. District Court for the Western District of Pennsylvania cited *McGriff* when observing that "the law of Pennsylvania is not clear on whether dismissal of a complaint as frivolous constitutes a decision on the merits" for purposes of claim preclusion.  *Hill v. Derrick*, No. 4:05-CV-1229, 2005 WL 8167912, at *4 (M.D. Pa. Nov. 3, 2005).

(quoting *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 501-02 (2001)).  Under Pennsylvania law, a "dismissal of an action for failure to state a claim is a final judgment on the merits."  *Brown v. Cooney,* 442 A.2d 324, 326 (Pa. Super. Ct. 1982).  Similarly, "[a] dismissal in the context of the grant of a motion for judgment on the pleadings is on the merits and constitutes a final order."  *Kerper v. Travelers Home & Marine Ins. Co.*, No. 2488 EDA 2013, 2014 WL 10919326, at *2 (Pa. Super. Ct. June 25, 2014).  Moreover, "[u]nder Rule 240(j), an action is frivolous if, on its face, it does not set forth a valid cause of action."  *Ocasio v. Prison Health Servs.*, 979 A.2d 352, 354 (Pa. Super. Ct. 2009) (quotation marks omitted).

In the Court's view, because the applicable standard for dismissal under Rule 240(j) is identical to the standard for dismissal for failure to state a claim — indeed, the Superior Court further illustrated this in Garland's state suit when it observed that the trial court had dismissed his complaint "for failure to set forth a cause of action upon which relief could be granted, pursuant to [Rule] 240(j)(1)," *Garland*, 2019 WL 517687, at *1 — and because a dismissal for failure to state a claim is a "final judgment on the merits" that obtains preclusive effect, it follows that a dismissal pursuant to Rule 240(j) should similarly be considered a "final judgment on the merits" for purposes of *res judicata*.[20;21]  In such a situation, the court must necessarily

---

[20]    *Compare Lane v. Riley*, No. CIV.A. 04-952, 2006 WL 2668514, at *2 n.4,*4 (W.D. Pa. Sept. 14, 2006) (finding *res judicata* did *not* apply where the Court of Common Pleas "entered an order denying [plaintiff's] motion to proceed in *forma pauperis,* based upon his failure to file a complaint in that court as is required by the relevant procedural rule," because "[w]ithout benefit of the [ ] complaint, the Common Pleas Court could not screen his cause of action" and as such "there was no prior determination by the common pleas court on the merits").

[21]    Interestingly, Pennsylvania Rule of Civil Procedure 233.1 may have some relevance to this discussion.  That Rule provides as follows:

(a) Upon the commencement of any action filed by a *pro se* plaintiff in the court of common pleas, a defendant may file a motion to dismiss the action on the basis that

"actually pass[ ] directly on the substance of [a particular] claim" before determining it is not viable. *Weinar*, 176 A.3d at 915.

Consequently, the Court is satisfied that the 2018 dismissal of Garland's state court suit by the Court of Common Pleas, which was affirmed by the Superior Court, constitutes a final adjudication "on the merits" for purposes of *res judicata.*

### b.     The four elements of *res judicata* under Pennsylvania law

Satisfied that the Court of Common pleas' dismissal of Garland's state suit was a final adjudication "on the merits," the Court turns to the four formal elements of *res judicata* under Pennsylvania law:  that the two actions share

(1) identity of the thing sued upon or for;

(2) identity of the cause(s) of action;

(3) identity of the parties; and

(4) identity of the capacity of the parties.

---

(1) the *pro se* plaintiff is alleging the same or *related* claims which the *pro se* plaintiff raised in a prior action against the same or related defendants, and
(2) these claims have already been resolved pursuant to a written settlement agreement or a court proceeding.

PA. R. CIV. P. 233.1 (emphasis added).  The Pennsylvania Superior Court has affirmed that by the "Rule's use of the term 'related,' it eschewed the technical precision associated with the doctrines of *res judicata* or collateral estoppel" and therefore "imposes a far less exacting standard on a defendant who seeks relief; rather than mandate that the plaintiff's claims be identical, the Rule merely requires that they be related." *Cicchiello v. Serv. Employee Int'l Union Healthcare Pennsylvania*, No. 579 MDA 2016, 2017 WL 128652, at *4 (Pa. Super. Ct. Jan. 13, 2017).  Moreover, Rule 233.1 "does not require . . . that the [former] matter has progressed to a 'final judgment on the merits.'" *Gray v. Buonopane*, 53 A.3d 829, 836 (Pa. Super. Ct. 2012).  Therefore, while under the logic described above, dismissal pursuant to Rule 240(j) is, in the Court's view, a final adjudication the merits which warrants preclusive effect, if the instant suit were brought in the Pennsylvania Court of Common Pleas as opposed to federal Court, a motion pursuant Rule 233.1, would warrant the suit's dismissal whether or not the prior suit's dismissal was considered to be "on the merits."

*Robinson Coal Co. v. Goodall*, 72 A.3d 685, 689 (Pa. Super. Ct. 2013). As discussed below, the Court finds that each element is satisfied here.

### i.      Identity of the thing being sued upon or for

The first necessary element — that the thing sued upon or for is the same in the two suits — is satisfied here. In his state suit, Garland sought "monetary damages" against, among others, several Pennsylvania probation officers, including Knorr, for their allegedly unlawful conduct — that is, their unlawful arrest and imprisonment, malicious prosecution, abuse of process, and retaliation and harassment of and against Garland "for [his] success in defending against the earlier SORNA violation charges lodged." *Garland.*, 2019 WL 517687, Attachment at 1-2.[22] The state suit alleged that in arresting Garland for probation violations in August 2017, Knorr "sought to harm" Garland and Garland's "liberty interests" and there was "no basis whatsoever" for his arrest and detention at the hands of Knorr. *Id.* at 2. In the instant suit, Garland seeks "compensatory damages in the amount of $750,000" and "punitive damages in the amount of $500,000," Am. Compl., Wherefore Clause, for the alleged unlawful conduct of Knorr and Hernandez — that is, their unlawful arrest and imprisonment, malicious prosecution, abuse of process, search and seizure, and retaliation and harassment of and against Garland, *see id.*, Preliminary Statement. In particular, Garland alleges that "Knorr was essentially looking for a reason to arrest [Garland] because [Knorr] stated, he . . . believed that [Garland] had broken the law," and "Knorr would not have conducted a search of [Garland] if [Garland] had not been released" on the SORNA charges. *Id.* ¶¶ 15-16.

---

[22]     The Court of Common Pleas' July 2018 decision, which quotes Garland's state suit complaint verbatim, appears as an attachment to the Superior Court's decision affirming the dismissal of the complaint.

A comparison of the allegations in the two suits makes clear that the thing being sued upon or for are the same — damages as compensation for the conduct of Knorr (and, in this suit, Hernandez as well), conduct which was motivated by animus towards Garland for the favorable termination of his SORNA charges.  Consequently, this element of *res judicata* is satisfied.  *See Robinson*, 192 A.3d at 1232 (finding this element satisfied where two suits sought the same relief for the same underlying conduct).

### ii.        *Identity of the causes of action*

The second necessary element for application of *res judicata* under Pennsylvania law — that the causes of action be the same — is also satisfied here.  Garland's state court complaint "include[d] nine counts and state[d] claims for malicious prosecution; false arrest and imprisonment; 'retaliation for the success related to the January, 2017 SORNA charges'; and 'punishment without due process and the violation of [Garland's] rights to be free from Ex Post Facto Puni[s]hment."  *Garland.*, 2019 WL 517687, Attachment at 3.  The Superior Court presumed that Garland brought these claims pursuant to § 1983.  *See id*. at *2.  In the instant suit, Garland asserts, pursuant to § 1983, claims for "malicious prosecution, abuse of process, false arrest and imprisonment, retaliation, [and] illegal search and seizure."  Am. Compl.. Preliminary Statement.

"Identity of the causes of action under the second element of res judicata exists 'when the subject matter and the ultimate issues are the same in both the old and new proceedings.'"  *Robinson*, 192 A.3d at 1232 (quoting *Cellucci v. Laurel Homeowners Ass'n*, 142 A.3d 1032, 1049 (Pa. Cmwlth. Ct. 2016)).  The Court finds that the causes of action in Garland's two suits are, for all intents and purposes, identical with respect to Knorr and Hernandez.  As with the instant suit, Garland's state suit was an attempt to obtain damages for what Garland saw as a

retaliatory and baseless arrest at the hands of several probation officers — and Knorr's hands in particular — which was motivated by animus towards Garland for his "beating" the 2017 SORNA charges.

Consequently, this element of *res judicata* is satisfied.

### iii.     Identity of the parties

The third element for application of *res judicata* is that the identity of the parties be the same.  Garland's state court suit named as defendants Probation Officers Dage Gardner, Benjamin Mallow, and David Knorr; "Unknown Arresting Officer;" and the City of Philadelphia.  *See Garland*, 2019 WL 517687, at *1.  The suit did not name Michael Hernandez. The relevant question then as to the identity of the parties is whether the state suit against Knorr (and others) but not Hernandez can have preclusive effect on this suit against both individuals. The Court finds that in these circumstances, it can and does.

As noted previously, under Pennsylvania law "[a]ny final, valid judgment on the merits by a court of competent jurisdiction precludes any future suit between the parties *or their privies* on the same cause of action." *Turner*, 449 F.3d at 548 (emphasis added); *see Stevenson v. Silverman*, 208 A.2d 786, 788 (Pa. 1965) ("The doctrine of res judicata applies to and is binding, not only on actual parties to the litigation, but also to those who are in privity with them."). "[P]rivity between the parties to past and present suits under [*res judicata*] can exist when the parties to such suits bear an agency relationship." *Robinson v. Fye*, 192 A.3d 1225, 1234 (Pa. Commw. Ct. 2018).  An agency relationship sufficient to establish privity exists "if one is vicariously responsible for the conduct of another, such as principal and agent or master and servant." *Montella v. Berkheimer Assocs.*, 690 A.2d 802, 804 (Pa. Cmwlth. 1997).  The Pennsylvania Superior Court has broadly defined privity in the context of *res judicata* as "mutual

or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right." *Ammon v. McCloskey,* 440 Pa. Super. 251, 261, 655 A.2d 549, 554 (1995), *appeal denied*, 543 Pa. 689, 670 A.2d 139 (1995).

As alleged, after arresting Garland but before transporting him to prison, Knorr contacted Hernandez, his supervisor, for approval to continue to detain Garland. *See* Am. Compl. ¶¶ 24-25. The Amended Complaint states that Hernandez's signature appears "on the request for probation revocation that charges [Garland] with accessing a computer." *Id.* ¶ 27.  The Amended Complaint also contends that "Hernandez should have known in August, 2017" that the conditions of Garland's probation — that is, the computer and internet ban —"would be a violation of [his] constitutional rights" and Hernandez "should not have given Agent Knorr permission to detain" and charge Garland. *Id.* ¶ 28.

Based on these allegations, the Court is satisfied that the supervisor-subordinate relationship between Knorr and Hernandez is sufficient to bring them into privity with one another.  In particular, they share an agency relationship in that they have an overlapping "identification of interest" in fulfilling the department of probation's mandates.  Moreover, as alleged, Hernandez's authorization of Garland's detainment by way of Knorr implies a sense of vicarious responsibility between Hernandez and Knorr.  *See Robinson*, 192 A.3d at 1234 (finding, for purposes of *res judicata*, that supervisory corrections officers were in privity with their subordinates where "as administrators," they "were accused of failing to remedy the wrongdoing of their subordinates"); *see also Cicchiello v. SEIU 1199P Union Serv. Employees Int'l Union*, No. 361 M.D. 2015, 2016 WL 1639015, at *4 (Pa. Commw. Ct. Apr. 26, 2016) ("[A]s observed by the federal courts, 'merely . . . naming additional defendants  . . . will not convert one cause of action into a second cause of action if both actions involve the same

liability-creating conduct on the part of the defendants and the same alleged invasion of the plaintiff's rights.'" (quoting *Coggins v. Carpenter*, 468 F. Supp. 270, 280 (E.D. Pa. 1979)).

The Court therefore finds this element of *res judicata* to be satisfied.

### iv.     Identity of the capacity in which the parties are sued

The final element for *res judicata* to apply requires that the parties be sued in the same capacities in both suits.  In his state suit, it is clear Garland attempted to sue the individual defendants, including Knorr, in their individual capacities.  *See Garland.*, 2019 WL 517687, Attachment at 1-2.  The same is true in the instant suit.  *See* Am. Compl. ¶¶ 2-3.  This element is therefore satisfied.

For all of the above reasons, the Court finds that the 2018 dismissal of Garland's state court complaint by the Court of Common Pleas, as affirmed by the Superior Court, has preclusive effect over the instant suit as to the Individual Defendants under the doctrine of *res judicata.*

### C.     Leave to re-plead

The Court is obliged to consider whether to grant Garland leave to re-plead some or all of his claims.  *See Kanter v. Barella*, 489 F.3d 170, 181 (3d Cir. 2007) ("Generally, a plaintiff will be given the opportunity to amend her complaint when there is an asserted defense of failure to state a claim.").  Although leave to amend pleadings, when not as of right, should be "freely give[n] when justice so requires," FED. R. CIV. P. 15(a)(2), the denial of leave to amend is appropriate where there exists undue delay, bad faith, dilatory motive, or futility.  *See Holst v. Oxman*, 290 F. App'x 508, 510 (3d Cir. 2008).

Here, the Court finds that Garland's claims against the Individual Defendants are futile; because they are barred by the preclusive effect of the dismissal of his identical state court

action, they cannot be re-pleaded here in any fashion.  These claims are therefore dismissed with prejudice.

As to the claims against the City, while the Court is skeptical that Garland will be able to allege facts that plausibly state (1) the elements of a conditions of confinement claim for violation of his Eighth Amendment rights and, moreover, *and* (2) facts necessary to support a *Monell* claim — that is, a municipal policy or custom — in an abundance of caution the Court will grant Garland a limited opportunity to re-plead.  Specifically, he shall have the opportunity to re-plead a single conditions of confinement claim against the City.[23]  However, the Court places him on notice that he is not to re-plead unless he can, in good faith, plead facts that plausibly state both (1) the elements of a conditions of confinement claim and (2) that his alleged constitutional deprivation was caused by a municipal policy or custom — both of which have been discussed herein.  Should Garland choose to re-plead, he shall have thirty (30) days from the date of this Opinion to file a Second Amended Complaint setting forth his allegations in support of a single conditions of confinement claim against the City.

---

[23]    For reasons noted previously, the Court finds Garland's allegations with respect to his *Gagnon* hearings to be too bare-bones and lacking in substance to warrant re-pleading.

## V.        CONCLUSION

For the reasons set forth above, the Amended Complaint is dismissed with prejudice as to the Individual Defendants.  The Amended Complaint is dismissed without prejudice as to the City.  Garland is granted the limited opportunity to re-plead a single conditions of confinement claim against the City should he, in good faith, be able to do so, in accordance with the directives set forth herein.

A separate Order follows this Opinion.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge